1029, Alpine, PCS versus United States. I'd like to begin with the second issue that we briefed, and that is the issue relating to the takings claim. It is our view that the takings claim was timely filed because it was just within a day but within six years of the final agency decision. And I think what's significant here is the teaching of the Williamson County case, which distinguishes ripeness from exhaustion. The court well knows that in the 1983 context, Patsy v. Board of Regents says there's no exhaustion requirement. Practitioners in takings claims were caught by surprise when the court said, but there is a ripeness requirement as to takings. And there is ripeness for sound reasons, sounding in the Fifth Amendment. As Williamson teaches in Hodel versus Virginia Mining, what's involved in a Fifth Amendment claim is just compensation. So are you arguing that there was no ripeness here of your takings case? Until January of 2010, correct. The claim was not ripe. The takings claim was not ripe until the FCC issued its final decision. I believe that date was January 5th, 2010. The claims commission case was filed January 4th, 2016. How do you really reconcile that with Martinez and its statement about permissive administrative remedies? And let me be really clear to understand where I'm focusing. You asked for a debt restructuring. You asked for a waiver. Your client did. These are permissive administrative remedies you are seeking, as opposed to compulsory administrative remedies, which must necessarily play out for exhaustion purposes. For permissive administrative remedies, which I think these clearly are, why doesn't Martinez govern? It seems to me that with respect to Martinez, in 47 CFR 1429A, it talks about what a party may do if it seeks relief. If it then wants to go on to the court, 47 CFR 1.115K says that it is required that the parties shall get that relief if they intend to go to court. So while it may have been permissive to choose to take that course, it still puts before the agency the question of what to do with the request. Put another way, Judge Moore? Yes, but Martinez says when you have a permissive administrative remedy, the plaintiff is not required to exhaust that. And it says as a corollary of that rule, I'm quoting, the court has held that a plaintiff's invocation of a permissive administrative remedy does not prevent the accrual of the plaintiff's cause of action, nor does it toll the statute of limitations pending exhaustion of that administrative remedy. I don't see why that's not directly on point in this case, because what we're talking about today isn't ripeness. It's accrual date. So I don't know why Martinez doesn't read exactly clearly and completely perfectly on this case. In a 1983 context, a litigant arguing that would be thrown out without relief, because the rule in Williamson and the ripeness requirement is that you must avail yourself of such process as you can in order to bring a Fifth Amendment claim, because of the just compensation requirement. I didn't cite the law review articles in the brief, because I didn't think this was an to address that. But this court is well aware, I'm sure, of the conundrum that 1983 litigants faced with respect to ripeness claims. You must avail yourself of such claims as state law permits in a state taking fine. By the time you have litigated each and every issue fully and fairly, everything you want to bring in a 1983 claim is res judicata, because the issues have already been decided and there is no effective federal forum. I guess I'm confused. I mean, I just feel like if this is the rule as you're articulating it, it would allow for a lot of gamesmanship to delay, delay, delay, delay the accrual date of the claim. You could file a motion for waiver, and then when that's denied, you could file a motion requesting debt restructuring, and then you could maybe ask them to reconsider both of those motions. I mean, just in this case, it stretched out over so many years. You knew that your licenses were taken. They auctioned them off and gave them to someone else over your objections. So I'm just really confused by why, I guess I don't understand this distinction that you're drawing between Williamson and Martinez for accrual date purposes. I'm sorry if I was unclear. Let me try again, if I may. Exhaustion is not the same as ripeness. Ripeness is a separate legal doctrine. Take a look at Patsy v. Board of Regents, where the Supreme Court explicitly held that the two are analytically distinct, and they're analytically distinct in a Fifth Amendment context to avoid gamesmanship. We don't want to revoke the takings clause and the just compensation requirement unless there's been a full review of what's beneath. So the gamesmanship that the Williamsons and the Virginia and the Hodel decision eliminate is sitting on a claim and trying to perfect it in another forum before there's a full record before that forum. So we don't think Martinez applies in a ripeness case. We think it applies in an exhaustion case. Implicit in the question you've asked me, Judge Moore, I gather, is your disagreement with Judge Letow on whether exhaustion was mandatory or permissive here, or whether the course the plaintiff sought was mandatory or permissive. We took the position it was mandatory. But even if we're wrong on Martinez, we're right on Williamson. And I don't see this court having squared the ripeness jurisprudence with the exhaustion jurisprudence. So we've raised that claim here because we think under Williamson, we did exactly what was required. Northwest Louisiana, for example. Why didn't you file a lawsuit right after the licenses were taken back and re-auctioned? I mean, at that time, arguably, if we're going to set up all the different points, different dates where accrual could have happened, that stands out, that you lost your licenses. They've been auctioned off. They've been sold to somebody else. Why didn't you file a lawsuit then, just to preserve your claim? There were various suits in this case, has been in and out of one court after another. This will probably be the last one, unless we're sent back. But I think what happened is the auction was won in 96. New regulations were promulgated by the FCC in 98. Alpine was asked to restructure. It chose not to. It then went ahead and paid on its licenses until it got involved in some financial difficulties in 2001, incident in 9-11. Then the FCC changed the playing field and evoked an automatic cancellation. I'm sympathetic that the playing field was changed. But the record shows that along the way, you were taking steps to preserve the claim. You were filing before the FCC. You were doing everything that a prudent, reasonable licensee would do in order to preserve their interest in the licenses, except when it came to the time that your licenses were re-auctioned, you didn't do anything. Well, I don't think that's true. In 2007, there was pending before the Telecommunications Bureau the motion for waiver and so forth. In 2002, the FCC said you can go ahead and operate on these licensees until there's a decision. In 2008, these were sold out from underneath, and my client then went and declared these as pre-petition assets, and the bankruptcy court disagreed, the D.C. Circuit disagreed, and so they waited for the 2010 decision. In 2010, they then went to the choice of forum, FORA, that the FCC directed them to, only to have the FCC claim, wait, we can't waive sovereign immunity, only Congress can. By the time that issue worked its way through the appellate courts, it's now 2014. So there was a two-year hiatus. Could that takings claim have been raised any time after 2010? I believe it could have. The question before this court was not whether it was efficaciously raised, but whether it was timely raised. And under Williamson County, I think that they had until the stroke of midnight on the last day they filed the claim. I don't see a decision from this circuit that eliminates the ripeness requirement, and indeed, I don't think this circuit can do so under Williamson County. Can I ask, what precisely was at issue in your, let's call it, appeal to the commission of the Wireless Bureau's dual rejections? There were several issues, and if this case ever went to trial, I think a fact finder and the court would have to reach six issues, and I'll call them issues sometimes of fact, issues of law, in fact, and issues of law. What regulations actually applied at the time the licenses were taken? Were they the ones that were the then-existing regulations? What relief was being requested from the commission? The licenses themselves, initially. But in the claims court, we're now looking for money damages because those licenses have long since been given away in 2008. So we're not exactly asking for the commission to take them back. But Alpine, as is pled, invested some $90 million in reliance on what the FCC had to say. When the FCC auctioned the license out from beneath them, they got a $5.3 million asking price. So there's $95 million, at least, that can be argued on a breach of contract claim, which has nothing to do with licensure authority of the FCC. So I was looking for an occasion to get into the first issue, and here we are. Is this a 402B5 claim? Can I ask this, and maybe this might be more appropriate for the government, but pursuing something that I guess at least Judge Reyna was just talking about. If you had filed a court of claims taking suit while the FCC proceeding was pending, would there or would there not have been a section 1500 objection from the government? I think there might have been. But more fundamentally, I think that there would have been a Williamson County claim, that it wasn't right for adjudication. I don't think we could have made it a Fifth Amendment claim until January of 2001. And you read Williamson. Williamson itself was a case in which I think the facts were that whether the claimant could even be permitted to use the land in such a way as to avoid there having been a Penn Central taking was still open. It wasn't, yes, we know there's a Penn Central taking, but there's still a remedy for money. Well, yes and no. I mean, I think the issue in any Williamson-related claim is what is the relief? And as Williamson stresses, that what's important in this line of jurisprudence is not the takings claim so much as the just compensation. That's what drives it. So at any point up until 2010, the FCC could have given a waiver. It could have given a refund. The Supreme Court said that. That is, has it gone beyond Williamson and said, even though a piece of property has been taken from you, given to somebody else, you cannot get it back, as long as you have a remedy for money, then the takings claim is not right. No, it hasn't used those exact terms, sir. But what it has said, it says a claim is not right until the government entity charged with implementing the regulations has reached a final decision. That's at 473 U.S. 186. There's been, this circuit in 2006 in the Northwest Louisiana case said, all events which fix the government's liability must, I've inserted the must, have occurred. And so it's our view that. And that's fixed the existence of a liability, not the amount of the liability. That may be where this creates an issue of first impression. And that's, I guess, partly why I was asking about precisely what was pending before the FCC. If what was pending was request for something that could not conceivably have been just compensation for the, you know, irrevocable loss of the license, which we will assume it was irrevocable after 2008 when it was in somebody else's hands, then there was a liability that was fixed even if you might have come away from the FCC with something partially compensatory. That's why I'm interested in whether full compensation was actually non-speculatively possible, was part of the request in the appeal to the commission from the Wireless Bureau of Dispatch. The FCC lacks the statutory authority to give monetary damages for the investment that Alpine put into it. So I think it. Something else, as you say, might have been compensatory. Yes, sir. What could, and you said that the Wireless Bureau should have granted a waiver of the automatic cancellation and should have, I think there was a second request, a request for general restructuring. Right. You couldn't have gotten restructuring once the licenses were gone because. That's a conundrum that I don't think the FCC can resolve. So what's the force, what is the scope of the challenge to the waiver of automatic cancellation after the licenses have been sold to somebody else? Among the steps the commission could have taken before its final decision that would have changed the posture going into a takings form is whether it was going to forgive anything under the restructuring or waiver request, whether it was going to offer refunds, whether it was going to offer equivalent spectrums, which would have had an economic or market value and could have been used as an offset against what the Alpine had invested, whether it was going to provide them with vouchers. The economic, the full. But it couldn't give you your licenses back and that's what you, that's the takings. That's what Alpine wanted initially, but by the time this litigation had evolved and the FCC had left them at the altar so many times, I think they were looking for a new suitor. So what's the focus of the takings here? It's the licenses. No, the focus of the takings are the consequential damages that Alpine incurred being led down a primrose path by the FCC for some 10 years, the $90 million it put in. But those damages accrue from what? It's from your loss of the licenses. In part, yes, but also from the expectation that we had, we were free to use them and we had the right to seek their restoration, yes. These are not actions that we undertook unilaterally. The reassurance is that the FCC gave the clients, at least as pledged, and we think those are among the issues of material fact that would need to be sorted out before the trial court. All right, Mr. Pattis, we need to move on to Ms. McCarthy. Good morning, may it please the court. If I may, I may start with the Supreme Court's decision in Nextway, which I believe is cited in the brief. In that case, the Supreme Court had, the FCC had already re-auctioned the licenses, which resulted in litigation, which this court referred to in Selco, in which other bidders were filing claims against the government and the Court of Federal Claims related to the re-auction licenses and the FCC's demand for the deposits back or decision to deal with those licenses. But the point is that the Supreme Court in Nextway gave the licenses back to Nextway because Nextway had entirely preserved its ability to challenge the revocation of its licenses. And unlike here, Alpine, by the time it had sought to challenge the auctioning of its licenses, those licenses as the D.C. Circuit held weren't part of the bankruptcy estate because they had been automatically canceled subject to the commission's regulations. But then isn't the question just whether, I mean, yes, in Nextway they gave the licenses back, but I didn't, isn't the question here whether just compensation is necessary? Well, to be clear, in 1940, the Supreme Court held in FCC versus Sanders that there's no property interest. That's not an issue in appeal. No, it's not an issue in appeal. Judge Leto incorrectly, in our view, held that there was a property interest, but that's never been resolved here. But it's not, I mean, if anything, we vacate and remand for further proceedings. We're not going to decide this case on the basis of, I mean, do you, have you asked us in your briefs to alternatively affirm in your favor on that property rights issue? No, because Judge Leto properly viewed the takings claims as untimely, assuming for argument's sake, which our brief does, that there is an existence of a property right. I guess the reason why I started with the Nextwave decision, the Supreme Court's decision in Nextwave, is that there are plenty of remedies here for Alpine had it chose to litigate them in a timely fashion. I guess I'm a little confused about the point you want to draw from Nextwave. What I thought I heard you say was the Supreme Court in Nextwave said that even after the licenses had been reoptioned to somebody else, the FCC had the authority to give them back to Nextwave. So why doesn't that make their request for a remedy pending before the commission until January of 2010 a request for, among other things, the possibility of getting the license back? Because they were too late. Because by the time their licenses were automatically canceled in 2002, and this is final and conclusive ruling by the DC circuit, they were not part of the bankruptcy estate. So by the time they went to challenge the re-auctioning of the licenses in 2008, they had long lost them. They had been automatically canceled by virtue of the commission's regulations. And to the extent that we're not addressing the merits here, but since it did come up by Alpine, joint appendix page 42 and joint appendix page 50, in pursuant to the security agreement, Alpine agreed to be subject to the commission's regulations under the Communications Act of 1934 as they amended from time to time. So to the extent that they're complaining about the automatic cancellation regulation that was changing the playing field, they bargained for that to the extent that this is a... Right, but I guess I was remembering that what they had, what they sought from the Wireless Bureau and then were denied and were appealing was the refusal to waive those provisions. Right. So if the commission had the authority to waive the automatic cancellation and pursuant to next waive, take the licenses back from whoever was using them in California or something, and give them back to Alpine, why was that not the same sort of thing that was at issue in Williamson? Namely, the alleged taker might end up not taking. So why litigate before you knew whether the taker was going to take? Well, I guess we're assuming that there's a... First of all, they'd have to establish and articulate a claim which has been resolved that they haven't been able to do, that there was some... In next waive, the Supreme Court held that the FCC had not followed the Communications Act. And here, there's no even allegation. The allegation that Alpine is making that somehow the very existence of the automatic cancellation rule is a violation of the terms of the security agreement, which it clearly is not because they expressly agreed to have the automatic cancellation allowed. And so to the extent that they could have challenged, I suppose, in district court under the APA, they could have challenged the validity of the automatic cancellation regulation, but they didn't do that. There's simply no claim anywhere to be resolved. Tell me why what you just said is something different from, on the merits, they don't have a takings claim. They haven't articulated, as Judge Leto correctly held below, they knew that their licenses were automatically canceled in 2002. And they could have gone to bankruptcy court and preserved that. They could have done something to challenge that claim, or they could have brought a takings claim at that point, if they could, to the extent that they have a property interest, which they don't. Then they certainly, as Judge Leto correctly held, they certainly knew that the takings claim would have accrued when it was auctioned off to other bidders. They could not obtain the next wave remedy at the Supreme Court or in bankruptcy court because they were too late. Their licenses were no longer part of the bankruptcy estate, which the D.C. Circuit held, because they were far too late. They waited four years, six years, my math is wrong, six years to try and challenge something that was already gone, was no longer there, a vibration of the rules. Can I ask, on the Martinez page, there's a string cite following the sentence that Judge Moore read earlier. Are some or all of those cases takings cases, or are they all, say, contract cases? And Martinez? As a corollary of that rule, the court has held that a plaintiff's invocation of a permissive administrative remedy does not prevent the accrual of the plaintiff's cause of action, nor does it toll the statute of limitations pending the exhaustion of the administrative. That's page 1304. And then there's, I don't know, five, six cases. I honestly, I can't honestly answer. I infer that they're contract cases, not takings cases, but I don't know. OK. We're on page 12, 1304. That's what I'm looking at. There's a sentence you read. We're arguing about how many. In any event, certainly Judge Aleto's decision regarding the preemption, the fact that these contract claims are controlled directly by this court's precedent, and in full. The law is that the court can't bring a claim until the government's liability is fixed, right? Yes. Yes. So is there, I'm trying to figure out what to make of their brief, which the government completely did not respond to at page 24, where they have this laundry list of remedies the government still could have provided them in response to their two requests, the waiver and the debt restructuring. This laundry list of remedies, which I guess they're saying could have been the just compensation for the taking, and they were still on the table, and could have been provided to them by the government in response to their requests, even after the time when the licenses had been re-auctioned. And so since this hadn't been resolved yet, this list on page 24, does that mean liability hasn't been fixed, such that the claim hasn't started to accrue? The liability for the takings claim? And we're assuming that there's a property interest in that? Yes, yes, because you assumed it in your brief, so stop talking about that. OK. The liability, I get, these were permissive appeals under the FCC to the extent that they're articulating a takings claim. And if I may know, just that Judge Horne and Folden held that there's no regulatory takings in the context of these FCC licenses cases, because of the lack of reasonable investment of expectations, and this is a highly regulated field. Putting all that aside, these were permissive remedies to the extent that they can articulate a property interest in a license for which they haven't paid, because they only paid for six-tenths of the license. They were able to enjoy use of this license. You're still arguing the property interest point, despite the fact that you didn't argue it in your brief, and I've asked you to move away from it and respond to my question? The licenses, our position, Your Honor, is that, although there was permissive remedies that the FCC could have provided, their claim didn't, they were permissive, and their licenses were canceled in 2002, and they therefore. My question is specific. It's, has the liability been fixed? The Supreme Court says, claim doesn't start to accrue until all liability's been fixed. Has the liability been fixed when these requests have not been ruled upon? Yes, because once the licenses are automatically canceled, they could have negotiated, the FCC had the authority to negotiate. Okay, but let me be clear. You said earlier that Judge Leto held that they could have in 2002. I didn't read his opinion that way. I read his opinion to say, they claimed they were unaware of the cancellation of licenses in 2002, and so I didn't understand him to make a fact finding about whether they were aware or not, because then he said, alternatively, at least as of 2008, they were aware. So I think you misspoke earlier when you were talking about 2002 and when you claimed that Judge Leto held in favor of the government. Well, he was assuming for arguments that he was taking them at their word that they were unaware of the automatic cancellation. Correct, so he didn't hold that as of 2002. If I misspoke, Your Honor. But anyway, it's actually my point, which is, did the liability get fixed or not? That's what I'm trying to figure out. I'm trying to reconcile Williamson, and I don't know what to do about it, because the rule doesn't make sense to me, as you can tell from the questions I've been asking as applied to this case. It doesn't make sense. If I extract that rule from Williamson and apply it to this case, I'm struggling with the idea that this is what the Supreme Court wanted from Williamson. But so I'm trying to find a way to make sense of this, and you're not helping, especially when you keep going back to the property interest thing. They've got a list of remedies which amount to just compensation they think the government could have given them that were still in play. Does that mean liability is not fixed? Assuming all those cases, then yes, that would be the case. We would disagree with that liability. We believe that their taking his claim was untimely, but I cannot say that there's nothing that the FCC could have done to provide them any sort of remedy. I guess what I was kind of hoping you were going to say is there's a difference between fixing liability and assessing remedy. That's kind of where I was hoping you were going to go. I was hoping you weren't going to say yes in response to that question. Any chance you want to think about that more? I mean, I don't know. I think our position is pretty clear. Their license is automatically canceled in 2002. They claim that they were unaware. They certainly knew that their licenses were gone from them when they were being re-auctioned when they challenged the bankruptcy court. So those licenses were not part of the bankruptcy estate because they had been automatically canceled in 2002. How is it you don't think Williamson has any application to this case? I mean, he's argued that Williamson changed the state of takings law. Because their remedy was really, in order to challenge, they tried to challenge the cancellation of their licenses in 2008 when it was too late. There wasn't any remedy through the court systems. I mean, this has been, they have, it's not, these are not, this is not an applicant. This is not a license holder who has been asleep at the switch. They have litigated and challenged everything, every step in the way. They've been into the D.C. Circuit several times. Can I ask you this same question I asked your counterpart? This is my 1500 question. At what point could they have filed, could Alpine have filed a takings claim in the court of federal claims and not met a 1500 objection? Do you know what I mean by 1500? Yeah, I know, I do know what you mean. The, so we're talking about a takings claim that wouldn't be preempted. They weren't really presenting, talking about the same facts and circumstances. I don't, I'm still not under, I'm not sure what their takings claim is. I still haven't, I know that this is, I mean. Right, but we have to assume, right, that they have a meritorious takings claim. They've articulated some sort of plausible takings claim that they have some sort of property interest that has been withheld from them without just compensation. I mean, would the pendency of the proceedings before the FCC up to January of 2010 in which they were seeking something that I think you agree, have they gotten it, might well have been just compensation for the assumed taking, would that have triggered a meritorious 1500 objection? Or because the FCC is not a court, would it not? It's not a court. But then they would have gone to the DC circuit and then it would have, presumably. After 2010 or before, I mean, it was pending before. Did they appeal the January 2010 denial of relief from the commission to the DC circuit? And so at that point, once they filed their petition for review, assuming that's what it is, they have a proceeding in court. I'm not sure that they appealed, I want to be precise about this. I'm not sure they appealed to 2010. What they appealed was the denial of their relief in bankruptcy court and then they appealed the rejection of their contract action filed in the DC. I think the DC circuit ruled against the FCC in December of 2010. The DC circuit, right. So after December, after the DC, well it was pending before the DC circuit. I assume, I don't have 1500 in front of me, so I'm just assuming for current purposes that there might be a distinction between a court proceeding and an agency proceeding, but I don't know how. We wouldn't have made it, I'm not sure we would have made a 1500 objection during the time when it was pending before the agency, but before the DC circuit if it were the same, presuming if it were the same facts and circumstances. I understood that at the time of the re-auction of the licenses that the only thing pending before the FCC was a motion to reconsider or a request to reconsider the staff decision with respect to the installment payments to change those. Is that correct? Yes, that is true. That's correct. At any time after that, could they have moved to amend somehow to try to bring some sort of allegation with respect to the re-auctioning? Those are two different issues, re-auctioning of the licenses and this motion for reconsideration that they were pursuing. That's the only thing left to pursue before the government, correct? Well, the re-auctioning claim is raised judicata. They lost the re-auctioning claim by fully litigating that in the back of the court and the district. They could not have raised a re-auction issue? No, they could not have. That was decided. The only thing that was pending was their petition for some sort of relief before the commission, before the full commission. Can you just talk for a minute about the Soriano case, which you cited? The Supreme Court case from 1957, kind of in the same vein as Martinez, but I don't have in my head. And that, I think, actually was a takings claim. Is that right? Yes, that was a takings claim. And the point is that if... So on the assumption that Martinez's comment was only about contract cases, what does Soriano do for you that Martinez, on that assumption, doesn't? It doesn't other than it's a takings... The reason why we cited Soriano is it's a takings claim and it stands for the proposition that at some point in time the plaintiff has to come into court and allege a takings claim that drawing out administrative remedies in perpetuity would... That's why we cited it. Has it been the government's position in other takings claims that the claim is not ripe until permissive administrative avenues for some or even all compensation have been pursued to their end? I'm not aware that our position is that a claim is not ripe until all permissive means are exhausted. No, I'm not aware that that's ever been our position. For these reasons, I see I'm well over time. For these reasons, primarily because of the preemption document doctrine application to the contract claims, we respectfully request that the judgment be affirmed. Thank you, Ms. McCarthy. Mr. Pettis, we'll give you your three minutes of rebuttal time that you requested. Thank you, Judge. Three comments with respect to the remedial issue that you raised, Judge Moore. Our view is that the liability is not fixed until potential offsets are set and that's the entire point of the Williamson doctrine, that before you're going to seek just compensations as a remedy for an unlawful taking, you need to know the extent of that compensation. So that, in our view, is the simple answer. As Judge Toronto, with regard to the Martinez issue, I went back the other day to look through the Williamson decision in 1989 and Hodel versus Virginia surface mining in 1981 and I saw no real discussion of Soriano in those cases and I don't know if this is one of these anomalies in the law where Soriano was decided in 1957. So I will take the view that Soriano is really an exhaustion case and not a ripeness case at all. If it were otherwise, I think the Supreme Court might have said so. But again, it's not clear to me and this case may be the case that clears that up. As to the automatic cancellation, there were issues, Judge Reina, of fact, the bankruptcy court, the circuit court in an unpublished decision in 2010 did say the licenses were cancelled in 2002 well before the bankruptcy filing in 2008. It's an unpublished decision. I think in the facts that we pled in the claims court, we talked about a communication from the FCC saying that the cancellation notification to the public at large was in error and that Alpine could continue to use those. That's one of those mixed questions of law in fact that we think makes the case trial worthy. 2008, they were cancelled, but they were re-auctioned within a year of having filed for relief that was not acted upon by the Telecommunication Bureau for some years thereafter. Again, why that's the case, whether there is an economic consequence to that that would permit us to seek money damages remains to be seen. Whatever the picture here, I regret that we didn't have the time to talk about 402b-5, and I know that rebuttal means keeping my comments within the comments that my adversary has made, so I will. I think that with respect to the takings claim, this court has yet to give teeth to the holding of Williamson and Hodel v. Virginia Mining Company. We look forward to this decision, and we ask you to remand. Can I just ask you, when the cancellation occurred? Was it August, I think? It was in 2008. No, no, the cancellation. Oh, well, there is a dispute effect about that, but there is a date of August 1, 2002. Yes, sir. So what is your substantive reason for why that was a taking? Forget about compensation. Why was that a taking? It was in contravention to at least one reading of the contract that Alpine had signed, which bound the FCC to certain regulations when they were approached and asked to adopt the 290-day default rule. The Alpine refused. If there are no further questions, thank you. I thank both counsel. The case is taken under submission.